Thomas E. BRYAN, Appellant,

v.

SID W. RICHARDSON, Inc., Appellee.

No. 16389.

United States Court of Appeals
Fifth Circuit.

April 8, 1958.

Oscar A. Mellin, San Francisco, Cal.,
David M. Coover, Corpus Christi, Tex.,
E. Hastings Ackley, Dallas, Tex., Mellin,
Hanscom & Hursh, San Francisco, Cal.,
for appellant.

Ira Butler, Herbert J. Brown, Charles
L. Stephens, Gillis A. Johnson, Fort
Worth, Tex., James C. Martin, Corpus
Christi, Tex., for appellee.

Before RIVES, BROWN and WIS-
DOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal tests the correctness of
the District Court's decree upholding va-

lidity of the dominant patent;[1] 162, and the continuation in part patent 903 and infringement on both by Bryan's device.

While Bryan's attack below took the full range of the typical infringer's defense, the case, after full trial and findings, comes to us considerably narrowed down.

The patents relate to the field of gas lift in the production of oil, the importance of which is attested by many such patents with which we have dealt.[2] In dealing, as most of them did, with the flow control valve itself, the emphasis has been on features which would assure continued regular performance of the valve under the high pressures and conditions encountered in view of the great cost in time and money as well as risk to the well itself when faulty valves have to be withdrawn and replaced. This was so because, up to the time of patent 162, there were but two principal types of control valve installations: (1) in a mandrel[3] by which the valve was positioned in an offset housing external to the tubing; or (2) in the axis of the tubing itself.

Each had a significant advantage but both had severe disadvantages and limitations. While in (1) it is obvious that the full internal diameter of the tubing was left open, the only way to remove the valve was to pull[4] the tubing so that the valve housing mandrel could be removed from the string, opened up, and the valve removed and replaced. On the other hand, while in (2) the faulty valve located axially in the tubing could be removed by wire line tools without pulling the tubing, the very presence of the control valve blocked the tubing so that numerous operations[5] were prevented or could be done only by removal of all such valves. In addition, if control valves were installed in series, as they frequently are, one such valve could not be removed selectively. All valves above it had first to be removed.

The problem then was how to install valves which would be (a) removable selectively without pulling the tubing while (b) leaving the tubing open for operations.

Neither Bryan, the self-professed father of the gas lift art, armed with all of his patents and prior knowledge, nor anyone else had resolved it. It was, the District Court held on evidence which we deem overwhelming, solved by the patentees of 162. The patent discloses a combination which in non-patentese may be described generally. The mandrel was designed so that it was bulged out along one side. Within the mandrel this left a longitudinal area that was a con-

1. Howard et al. 2,664,162, application June 24, 1948, patented December 29, 1953, issued to Kenneth C. Howard, Harold E. McGowen, Jr., and Howard H. Moore, Jr.

   McGowen et al. 2,679,903, issued to Harold E. McGowen, Jr. and Howard H. Moore, Jr., application November 23, 1949, patented June 1, 1954.

2. See e. g., Guiberson Corp. v. Garrett Oil Tools, Inc., 5 Cir., 205 F.2d 660, footnote 3, p. 662; Bryan v. Garrett Oil Tools, Inc., 5 Cir., 245 F.2d 365; Price-Trawick, Inc., v. Gas Lift Corp., 5 Cir., 101 F.2d 134; and United States Industries, Inc., v. Otis Engineering Corporation, 5 Cir., 254 F.2d 198.

   As these cases illustrate, gas is put into the annular space (the space between the well casing and the tubing through which the oil flows) under pressure; control valves are then installed, generally in series, which, at predetermined pressures, permit the entry of gas from the annular space into the tubing either to lighten the column of oil by aeration or to lift a slug to the surface.

3. A mandrel, as the term is generally applied, is any specially designed structure that is threaded, top and bottom, to be screwed into and form a part of the tubing. Its outside diameter is generally somewhat larger than that of the tubing.

4. An expensive operation, estimated to run from $5,000 to $25,000 in cost, it was likewise accompanied by risk to the well. See footnote 3, Guiberson v. Garrett Oil Tools, note 2, supra.

5. These included swabbing, paraffin cutting, bottom-hole pressure surveys, etc.

tinuation, without obstruction, of the tubing. In the internal space of the expanded portion provision was made for seating a conventional control valve so that, at a point *below* the seat, the port of the valve was exposed to the annulus. With the control valve in this position, the tubing was unobstructed and, at the same time, a portion of the valve (or its adaptor) was exposed within the mandrel for selective removal and replacement if necessary. This was to be accomplished by conventional and well-known devices, such as whipstocks and fishing tools, by which to effect the movement of the valve laterally to and from the axis of the tubing to the valve seat.

What had long been needed had now been found. What had been found, or its substantial equivalent, by commercial production beginning in 1952 became, and was, a great commercial success at the time Bryan introduced his device in 1954. Not surprisingly, what had long been unseen then became, retrospectively, perfectly obvious. And as a major stronghold in his system of fluid defenses below, Bryan took the usual tack that 162 was invalid as lacking in invention and novelty. Whether, under the specifications of error, the District Court's ruling adverse to him on this point is open to review as a technical matter, we need not determine. For Bryan, with a remarkable faculty for taking positions contrary to his own conduct which led the District Court to reject his testimony altogether,[6] in extravagent language of his own subsequent patent application [7] in 1954 boasted that he had made precisely the same great discovery.

In this predicament Bryan's very able counsel now likewise champions the idea of novelty. But confining novelty to the manner in which the valve is moved laterally and is seated or unseated, he now levels the concentrated attack on the claims. Here again it is accompanied with that traditional flexibility seemingly inherent in the art of patent law in which, for validity the protest is that the claim is too broad, while for infringement it is to be narrowly and literally applied. That attack is here centered on the principal Claim [8] No. 1 on the ground that it is so broadly stated

---

**6.** The District Court in its opinion stated: "I hesitate to find that he [Bryan] deliberately falsified, but his testimony is of such a nature, so unsatisfactory, so many times in the face of the clear facts and his attempted purloining of plaintiff's invention so deliberate and brazen, that I find against him on all disputed issues."

**7.** Bryan filed application June 8, 1954, Serial No. 435117, for "Offset Valve Arrangement For Gas Lift System," patent not yet issued on date of trial but in which the Examiner had allowed claims 8 and 9. Bryan offered this to establish that the accused device, based on his patent application, was for a patentable improvement and hence not an infringement of 162 and 903. In that application he swore:

"Heretofore such injection valves have either been placed directly in the tube or have been attached to the side thereof in the most well known and widely used systems.

"Certain attempts have been made to provide offset pockets or chambers within the tubing for receiving these valves, but up to the present time no satisfac-

tory arrangement of this type has been known and a gas lift system with an offset chamber in the tubing for receiving the valve has thus not been determined to any degree of commercial acceptance."

**8.** Claim 1 of Patent 162, letters in brackets [ ] are inserted and emphasis supplied to pinpoint Bryan's criticism:

"Claim 1 of '162

"[a] In combination with a well tubing

"[b] said tubing including one or more flow valve receiving sections

"[c] each (section) having a portion laterally offset from the vertical main bore and provided with a flow valve seat in the offset portion

"[d] and *means*, including a shifting tool *adapted* to be lowered from the top of the tubing to the level of a selected section for selectively *seating* or *removing* a flow valve in or from its seat within a selected section

"[e] said shifting tool being provided with *means* for moving said tool and its appendages laterally within the offset portion of the selected section."

Claims 4 and 6 are also held valid and infringed. These append to Claim 1 as

as to define the invention solely by statements of function and result. We do not agree.

The novelty was not, as Bryan claims, the mechanism by which the tool could be laterally shifted to insert or retrieve the valve. The novelty, as the Court found, was the " * * * combination of co-acting elements of a side-pocket mandrel and shifting tool which left open the tubing bore and yet had full selective retrievability of flow control units. Under prior-gas lift apparatus this had not been possible before." Bryan's contention that [a], [b], [c] of Claim 1, note 8, supra, are, or may be, old in the art, does not make the patent for a combination invalid. A combination whether composed of all old, or some old and some new elements, is patentable if it achieves an altogether new and useful result. Cameron Iron Works, Inc., v. Stekoll, 5 Cir., 242 F.2d 17; Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 176 F.2d 783. The life of such a combination is not to be destroyed by excision of its several parts without benefit of anaesthesia, nor is the cause of its vitality to be discovered by the prosector's retrospective dissection. Jeoffroy Mfg., Inc., v. Graham, 5 Cir., 206 F.2d 772, 776.

Nor does that cause the *means* portion of [d] and [e] of Claim 1, note 8, supra, to infect the whole new combination with a virus of invalidity. E-I-M Co. v.

Claim 4 refers to well-known "jars" and Claim 6 states "wherein the flow valve seat is formed in a flat base portion of each of the flow valve receiving sections."

9. "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts, described in the specification and equivalents thereof."

10. Cf. Moist Cold Refrigerator Co. v. Lou Johnson Co., 9 Cir., 217 F.2d 39, 42; see also Application of Lundberg, Cust. & Pat.App., 244 F.2d 543, 547.

Philadelphia Gear Works, Inc., 5 Cir., 205 F.2d 28, 29. The Court, on ample evidence, found that [d] and [e], relating to the movable elements, referred to well-known devices such as kickovers, centralizers, whipstocks or slanted guides and other tools or devices, such as wire lines, knuckle joints, jars, threading and latching for selectively seating or removing the valve.

The word "means" is no shibboleth. To be sure, it, or its equivalent synonyms, cannot be used to describe the invention at the very point of novelty for to do so would then be to define invention in terms of the result. But where the novelty of the combination—here the "stationary element or receiving section consisting of a side-pocket mandrel as an integral part of the tubing string * * capable of selectively receiving, seating, and disgorging a flow control unit * * lowered from the surface * * * " is adequately disclosed with definable limitations, other and well-known elements need not be described in structural detail. Section 112 of the Patent Act of 1952, 35 U.S.C.A. § 112, expressly[9] permits it. If Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3, caused either a real or psychosomatic[10] infirmity in the body of the prior law, it is plain that Section 112 was meant as a sufficient transfusion to restore vitality to the principles before and since pronounced.[11]

11. Faulkner v. Gibbs, 338 U.S. 267, 70 S. Ct. 25, 94 L.Ed. 62; General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; Davis Sewing Machine Co. v. New Departure Mfg. Co., 6 Cir., 217 F. 775; see Commentary Examiner in Chief, U. S. Patent Office, in the Introduction to Title 35 of U.S.C.A. p. 25; Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S. Ct. 748, 52 L.Ed. 1123; E-I-M Co. v. Philadelphia Gear Works, 5 Cir., 205 F. 2d 28; Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 176 F.2d 783; Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 2 Cir., 247 F.2d 343; Georgia Kaolin Co. v. Thiele Kaolin Co., 5 Cir., 228 F.2d 267; Ellis on Patent Claims (1949), Sections 263, 264, pages 346–8.

When the claim with this language in it is construed in the light of the disclosures of the patent, it does not grant a monopoly on every means or mode by which that result could be achieved. As the Act phrases it, these are confined to corresponding structures or acts described in the specification and equivalents thereof. Our discussion of infringement will demonstrate that the Court's findings of equivalency on these elements is likewise supported.

The Court's holding of validity of 162 was adequately supported by facts and was correct. Bryan v. Garrett Oil Tools, Inc., 5 Cir., 245 F.2d 365, 371; Georgia Kaolin Co. v. Thiele Kaolin Co., 5 Cir., 228 F.2d 267; Jeoffroy Mfg., Inc., v. Graham, 5 Cir., 206 F.2d 772.

### Validity of 903.

■■ For the reasons discussed concerning 162, the claims in suit [12] of continuation patent 903 satisfy the requirements of invention and novelty. Like the dominant patent 162, it comes here with the presumption of validity. 35 U.S.C.A. § 282; Jeoffroy Mfg., Inc., v. Graham, 5 Cir., 219 F.2d 511, 519.

In 903 the flow valve receiving section of the mandrel was designed to take advantage of the known principle of balanced pressures. In the drawings of 903 and the disclosure, there was an external recess in the wide part of the mandrel. Above and below the recess there was a circular opening through which the valve was inserted and thus sealed. When installed, the bottom end of the valve with its port opening into the tubing was inside the mandrel below the recess, and the top portion of the valve was inside the mandrel above the upper recess. The port of the valve for admission of gas from the annulus was exposed in this recess. This was a useful improvement as a sub-combination in the combination, the novelty and usefulness of which involved the employment of double seats above and below the point where the mandrel opened onto the annulus.

But, Bryan says, that since it is his contention that the accused device does not include the external recess of Claim 2 or the guide means in Claim 3 and the internal ring in Claim 4, so that infringement, later discussed, can result only by equivalence, then all four claims are a substantial restatement of Claim 1 and as such are anticipated by prior patents,[13] Kyner 247, Bryan 345, and 648 and Garrett 107.

---

12. Only Claims 1, 2, 3, 4, are involved here. The remaining claims are directed to the combination of the valve housing and a described form of shifting tool.
"1. Well tubing comprising a flow control unit receiving section having an enlarged intermediate portion of greater internal cross sectional area than the internal cross sectional area of the ends thereof, a laterally offset internal elongated tubular portion formed in the enlarged intermediate portion having upper and lower portions provided with aligned openings forming seats for said unit."
Claim 2 adds words describing "an external recess formed in the enlarged intermediate portion, said recess having upper and lower wall portions provided with aligned * * * openings." Claim 3 adds "guide means for the flow control unit comprising an internal ring located within the enlarged interior of the special section having its opening in align-

ment with the opening in the transverse wall portion." Claim 4 specifies "an external recess," "upper and lower wall portions," and "an internal ring within the enlarged portion having an opening above and in alignment with the aforesaid openings to provide means for guiding the flow control unit into the upper and lower wall openings."

13. Kyner 2,210,247; the flow control valve is manually placed in an external housing and can be removed only by pulling the tubing to the surface.
Bryan 2,275,345; removable gas lift valve, the valve located in the axis of the tubing.
Garrett 2,230,107; insertable and removable valve located in the axis of the tubing.
Bryan 2,255,648; gas lift apparatus located in the axis of the tubing.
See Bryan v. Garrett Oil Tools, Inc., 5 Cir., 245 F.2d 365.

■ This argument rests on the premise that the claim is to be read apart from the disclosures of the patent so that literally the flow control unit receiving section described could be situated outside of the tubing or the axis of the tubing with no requirement that it be possible to insert or remove valves without pulling the tubing or clearing the axis of the tubing. But of course the claims are to be read in the light of other claims. W. D. Haden Co. v. Mathieson Alkali Works, Inc., 5 Cir., 122 F.2d 650, 651, and, as the Court below pointed out, "Claims 3 and 4 * * * call for 'guide means' and 'means for guiding the flow-control unit' which would be wholly unnecessary for manual insertion at the surface," and, in addition "the last five claims * * * exhibit that they are for tools for underground use with the stationary element * * *." The patent, by claims and specifications, disclosed that it, as a continuation in part of the dominant patent, was to achieve the novel function of selectively seating or retrieving control valves without pulling tubing or blocking the tubing axis.

## Infringement of 162 and 903.

At the outset, we affirm as clearly supported both the implication and the express holding that Bryan's device is traceable in fact directly to these patents. Despite his long experience in this field, both by deed and word, he affirmed the utility of the dominant patent by the fact that not until 1954, two years after the first commercial version of the patent was put on the market with considerable success, did he ever design or construct the accused device. He had, in the meantime, also obtained in 1952 shop drawings in connection with the settlement of a license dispute. Indeed, it goes even farther back for in 1948 he received, although he later made a denial which the Court discredited, see note 6, supra, original drawings from McGowen. This was followed by several conferences with McGowen at Bryan's shop in Fort Worth where, at first, he encouraged these young men to work out an arrangement

with him, although later, by a change of tune, be began to suggest that their device was of little value if it were not an infringement of some of his own existing patents.

There was nothing to suggest, indeed much contradicted it, that Bryan at any of these times had conducted any research or experiments which led him to this discovery. He got by taking, not inventing. Matthews v. Koolvent Metal Awning Co., 5 Cir., 158 F.2d 37, 39; Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 176 F.2d 783, 786.

If there is no infringement, it is because the effort to copy and imitate has been so cleverly done that the device does not operate in substantially the same way as either or both of the patented combinations or sub-combinations.

The District Judge, familiar as he was with oil and gas operations and its long-time importance to the economy of Texas, described this device as one which "fulfilled more than a long-felt need in the industry, something new and useful, which might be said, without overstatement, almost to be revolutionary * *." Because of its great utility, it "was meritorious and a further important step forward in the art," Southern Saw Service, Inc., v. Pittsburgh-Erie Saw Corp., 5 Cir., 239 F.2d 339, 345, and as such was entitled to a reasonable and liberal interpretation in the light of the full disclosure and to a reasonable range of equivalents.

A comparative analysis, claim by claim, element by element, matching patent against device, helpful both to trial and appellate court, Bryan v. Garrett Oil Tools, Inc., 5 Cir., 245 F.2d 365, reveals here that these claims of 162 read literally on the accused device. The accused device has a side-pocket mandrel with provisions for a valve seat in the offset portion permitting the seating and removal of valves by tools which deflect laterally and can be operated from the surface.

It does not matter that this is accomplished in Bryan's device by operations

or structures which are somewhat different in form. For what is done is done substantially in the same way, by substantially identical means, by substantially the same mode of operation to produce the admittedly identical result. That the specifications and drawings in 162 (and the claims 2 and 3 not here in suit) describe apparatus by which the valve is seated or unseated by being screwed into the flow valve receiving portion of the mandrel either by an electrical reversible motor or mechanically by a rachet drive is not decisive. Protection of the patent is not "limited to the preferred embodiments shown in the drawings," Cameron Iron Works, Inc., v. Stekoll, 5 Cir., 242 F.2d 17, 20; Jeoffroy Mfg., Inc., v. Graham, 5 Cir., 219 F.2d 511, 514. The seating and sealing of a valve by screw threads is the mere mechanical equivalent of other means such as O-rings and latches, Bryan v. Garrett Oil Tools, Inc., 5 Cir., 245 F.2d 365, 368.

The same is true of the means used in Bryan's device to deflect the tool laterally. He uses a slanted guide near the upper collar of the mandrel with compressible fingers which, depending on the length of the tool with its adapter permits it to move laterally into the expanded portion of the mandrel or continue down through the tubing to the location of the valve to be selected. In 162 a bow or leaf spring which is actuated by a simple trigger accomplishes the same thing. Both are variants of the ancient learning of whipstocks. While it is true that in 162 the valve is seated so that the main body of the valve protrudes out into the annulus through the expanded portion of the mandrel, the accused device must, of course, accomplish the same thing by exposing a valve port to the annulus. The same result is achieved by substantially similar means for in both the valve is seated and sealed *above* the port exposed to the annulus and the record affirms that holes drilled in the side of the mandrel (either in Bryan's or the commercial version of 903) is the equivalent of a recess. The valve is thus exposed in fact to the annulus. If it be assumed *arguendo* (we neither decide nor intimate decision) that the accused device was a patentable improvement over 162 on this score, that would not excuse infringement of the dominant patent. Hunt Tool Co. v. Lawrence, 5 Cir., 242 F.2d 347, 352; Matthews v. Koolvent Metal Awning Co., 5 Cir., 158 F.2d 37, 40; Zachos v. Sherwin-Williams Co., 5 Cir., 164 F.2d 234; Temco Electric Motor Co. v. Apco, 275 U.S. 319, 338, 48 S.Ct. 170, 72 L.Ed. 298, 302.

The obvious imitation of 903 is even more startling than in the case of 162 once it is recognized, as the evidence here overwhelmingly commands, that the external recess described in the specifications and drawings and referred to in several of the claims, is the equivalent, or vice versa, of several holes drilled in the side of the mandrel as in Bryan's device and the commercial version of 903. There is first the expanded portion of the mandrel with an internal elongated tubular portion formed in the expanded section of it. There is an upper and lower portion either above the external recess in the form shown on the drawings or its equivalent by ports in the mandrel. And this is provided with aligned openings forming seats for the control valve. On the drawings these are shown as the guide ring and the two aligned openings with valve seats. The tubular socket with its tapered top of Bryan's device is again the mere equivalent of this. There is an opening by holes through the mandrel to the annulus and in the tubular socket there are two internal rings, one above, one below, the ports to the annulus and against which Bryan's O-rings effect two seats in the upper and lower wall portions. In the catalogue Bryan offered Chevron rings as a substitute for O-rings as the customer preferred. Both were "ring seals."

The Court had more than an ample basis for concluding in fact that Bryan took not only the idea but the means of accomplishment, and that his skill was di-

rected toward contriving a mechanism which appeared to be, but was not in fact, different than 162 or 903. There it ends. Georgia Kaolin Co. v. Thiele Kaolin Co., 5 Cir., 228 F.2d 267; Fritz W. Glitsch & Sons, Inc., v. Wyatt Metal & Boiler Works, 5 Cir., 224 F.2d 331; Jeoffroy Mfg., Inc., v. Graham, 5 Cir., 206 F.2d 772.

Bryan's Defensive Counterclaim.

■ Each defense having thus successively collapsed, Bryan retreats now to the last, but favorite isle of resistance, to claim that while found to be a poacher he may nonetheless keep his game because the patent owner has been guilty of monopolistic abuses. This was certainly a fact issue and the Court by findings not clearly erroneous resolved it against him. In the main it was nothing more than the lament that the patentee had given written (and oral) notices to several oil companies, as prospective users of Bryan's device, that the machine infringed on these patents. A patentee has that right, Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 176 F.2d 783, 785; Gillman v. Stern, 2 Cir., 114 F.2d 28, 32. Indeed, his ability to recover indemnity may date from it, 35 U.S.C.A. § 287; Livesay Window Co., Inc., v. Livesay Industries, Inc., 5 Cir., 251 F.2d 469. Moreover this is a reasonable thing for businessmen to do since it is hardly to be thought that it is a sign of *bad faith* to warn friendly customers, present or potential, that if they purchase a competing infringing tool, litigation against them might be necessary. Nor does the failure to sue the users thus warned give it a bad brand. If the patent exists, and is valid, as we have held, the warning is a legitimate sanction. A patent is to protect the patentee in his monopoly against the depredations of others. He may sue, but he need not, and if he sues, he may take after a user or the manufacturer or both. The infringing manufacturer cannot complain that the gage lay at his feet.

Affirmed.