**U. S. INDUSTRIES, INC., Plaintiff,**

v.

**CAMCO, INCORPORATED, Defendant.**

Civ. A. No. 9580.

United States District Court
S. D. Texas,
Houston Division.

Dec. 23, 1958.

Thomas E. Scofield, Kansas City, Mo., James B. Simms, James T. Wright, Houston, Tex., for plaintiff.

W. Brown Morton, Jr., Robert McKay, New York City, Tom Arnold, Houston, Tex., for defendant.

INGRAHAM, District Judge.

1. The jurisdiction of this Court over the cause of action asserted by the complaint is based on the patent laws of the United States; venue is admitted. The complaint, filed February 29, 1956, charges infringement of the King United States Letters Patent No. 2,339,487 by defendant's manufacture, sale and use of certain gas lift valves outside the permission granted by a license agreement of June 4, 1947, and within the scope of the patent. The amended answer admits existence of the patent and license agreement, but denies that any gas lift valve manufactured, sold or used by defendant was outside the permission of the license, denies that any such valve was within the scope of the patent, and denies the validity of the patent.

2. The jurisdiction of this Court over the cause of action asserted by the first counterclaim is based on the diversity of citizenship of the parties and the fact that the amount in controversy exceeds $3,000, exclusive of interest and costs. The first counterclaim, filed with the amended answer in October, 1956, alleges that the disputed license agreement of June 4, 1947, was entered into in Texas by parties all of whom at the time

of execution thereof were residents of Texas and that it grants to defendant a license under the King patent broad enough to exempt all defendant's acts complained of from prosecution as infringements of that patent. The answer to the first counterclaim consists essentially of a general denial.

3. The jurisdiction of this Court over the cause of action asserted by the second counterclaim is based on the patent laws of the United States. The second counterclaim, also filed with the amended answer in October, 1956, alleges that, the license agreement of June 4, 1947 is in terms terminable by plaintiff upon a judicial determination that defendant has infringed the King patent outside the permission of the license, that plaintiff has threatened in writing to exercise its right of termination if successful on the present complaint, and that after termination defendant will be free to contest the validity of the King patent. The prayer is for a declaratory judgment that the King patent is invalid. The answer to the second counterclaim consists essentially of a general denial.

4. Plaintiff, U. S. Industries, Inc., a corporation of Delaware, is the assignee of the rights and obligations of Olsco Manufacturing Co., a corporation of Texas, a licensor under the license agreement of June 4, 1947 and is the owner of the King patent in suit. H. U. Garrett was a co-licensor with Olsco and, insofar as this action is concerned was a predecessor in interest of, and a present managing agent for, plaintiff.

5. Defendant, Camco Incorporated, a corporation of Texas, is one of the licensees under the license agreement of June 4, 1947 and has manufactured, sold and used the valves alleged to constitute the basis of plaintiff's charge of infringement.

6. Plaintiff and defendant are competitors in the manufacture, sale and installation of valves and other equipment for use in gas lift for oil wells.

7. Gas lift is a broad term designating a variety of arrangements for raising liquid using a stream of gas under pressure acting directly on the liquid as a means to bring the liquid up.

8. The King patent in suit, entitled *"Time and Volume Control for Gas Intermitters,"* was issued January 18, 1944, containing thirteen claims. Only the claims numbered 4, 5, 6, 7, 8, 9, 10, 11 and 13 are asserted to be infringed. Of these, claims 4, 8 and 9 are "valve" claims relating to details of the structure of a valve for use in gas lift; claims 5, 6 and 7 are a group of "system" claims relating to a series of valves of any structure having a certain mutual functional relationship and being associated with a specified surface control in a well on gas lift; and claims 10, 11 and 13 are another group of "system" claims relating to a series of valves in the same mutual functional relationship as in claims 5, 6 and 7, but being of a specified structure as to their loading and responsive elements. The application for the King patent was filed May 25, 1940.

9. The license agreement of June 4, 1947 was duly executed by the parties thereto, has not been amended, modified, repudiated, revoked or rescinded, was duly and properly assigned to plaintiff, and is now in full force and effect between plaintiff and defendant.

10. The value to defendant of its asserted right to continue its present business under the license agreement of June 4, 1947 is in excess of $3,000, exclusive of interest and costs.

11. The valves manufactured by defendant to which plaintiff's allegations of unlicensed infringement are directed are those designated in defendant's catalogues as Types CK, AK, RC, RH, H, C, RCF, D, RCC, RHC, DC, HC, and BK.

12. Defendant has sold and supervised the installation of the valves listed in Finding 11 in oil wells, with the valves arranged for gas lift in series in which the bellows element of each of the valves was sealed at a different pressure to provide a sequential opening of the series upon the application of a lifting gas thereto to first open the lowest pressure

valve, thereafter to open the remaining valves of the series, the valve opening at the lowest pressure being installed the furthest down the well and the valves opening at successively higher pressures being installed successively higher in the well.

13. The license agreement of June 4, 1947, is an integrated writing embodying the whole understanding of the parties at the time of its execution, is without latent or patent ambiguity, and requires the consideration of no extrinsic evidence to ascertain its legally effective meaning.

14. The granting clause (Article II) of the license agreement of June 4, 1947 authorizes defendant to install valves "in accordance with any system claim" of the King patent, hence to install valves meeting the definition of system claims 10, 11 and 13, and consequently to install a series of valves, each valve including a pressure sealed bellows unit, each of said bellows being sealed at a different pressure to provide a sequential opening of the series upon the application of the lifting gas pressure to first open the lowest pressure valve and thereafter open the remaining valves of the series as such pressure is increased.

15. There is a "Note" appearing on the drawings, Exhibits A and B, annexed to the license agreement of June 4, 1947, which provides: "All valves in a setting have bellows charged to same pressure. Differential adjustment is made by adjusting the spring". This note does not derogate from the breadth of the granting clause, but serves only to bring explicitly within the scope of the licensed use of the King system claims the use of the systems of claims 5, 6 and 7 in which the valve settings therein prescribed are obtained in the manner set forth in the note.

16. The granting clause of the license agreement of June 4, 1947 grants to defendant a license to make and sell the valves of Exhibit B thereto and similar valves. Such license can only be exercised by a making and selling which, but for the license, would infringe *per se* some claim of the patent. The only "valve" claims of the patent are those numbered 3, 4, 8, 9 and 12. The granting clause excludes from the license valves in which a seal is effected to protect the bellows against excessive pressures and thus expressly excludes a license under claims 3 and 12. Consequently, the license to make and sell is a license to make and sell valves similar to Exhibit B which infringe claims 4, 8 and 9, there being no exclusion, expressed or implied, applicable to these claims.

17. All valves listed in Finding 11 are valves "operated by pressure exerted on a bellows in which no seal is effected upon a predetermined distortion of the bellows from pressure acting upon the surface thereof for protecting the bellows against excessive distortion due to increases in pressure of the operating fluid beyond the pressure necessary to actuate the valve," are similar to the valve illustrated in Exhibit B attached to the license agreement of June 4, 1947, and their manufacture, sale and use is consequently within the permission of the license.

18. The word "similar" is used in the license agreement of June 4, 1947 in its ordinary sense and has no special or technical meaning in the gas lift field where it is customarily used in that ordinary sense. It does not mean exactly alike, but rather means like in quality, nature, degree, purpose, or other characteristics.

19. Nothing in the license agreement of June 4, 1947 affords a basis for finding valves to be dissimilar from the valve of Exhibit B by reason of their manner of attachment to well structure, so that valves which are attached to the well through check-valve structures built integral with the valve body and valves attached to the well by means making them retrievable by a wire-line operation are to be deemed similar, and hence licensed or not licensed, on their own merits as valves *per se.*

20. All variations between the structures of the several valves listed in Finding 11 and the structure of the valve illustrated in Exhibit B to the license agreement of June 4, 1947 are improvements in valves which have been made or acquired by Camco and are not improvements in valves which have been made or acquired by Olsco or Garrett or the successors of either of them.

21. The extrinsic evidence introduced by both plaintiff and defendant without objection by either confirms the meaning of the license agreement of June 4, 1947 reached upon a consideration merely of its terms.

22. The license agreement of June 4, 1947 was negotiated for the plaintiff by Ralph R. Browning, a patent lawyer, now of counsel for plaintiff, and for Camco by Ray L. Smith, a patent lawyer, now independently employed by Hughes Tool Co.

23. There was no discussion during the negotiation of the license agreement of June 4, 1947 of the "Note" appearing on Exhibits A and B attached thereto.

24. Mr. Browning procured the inclusion in the license agreement of June 4, 1947 of the limitation, "no licenses granted for the manufacture, use or sale of any improvements in valves which has been or may be made or acquired by Olsco and Garrett, or either of them", because of his stated belief that the granting clause of the license did not exclude a valve in which the bellows was inverted, notwithstanding that the then drafted granting clause included limitation to valves shown in Exhibit B and "any other similar valve".

25. The license contains an express admission of validity of the King patent and an agreement not to contest the same. During the negotiation, the limitation on the duration of Camco's agreement not to contest the validity of the King patent was changed from "during the life of said patent" to "during the life of this agreement".

26. At the time the license agreement of June 4, 1947 was negotiated, Olsco and Garrett believed that a seal to protect the bellows against excessive well pressures was a necessary element of a practically successful, bellows-operated, gas lift valve.

27. The license agreement of June 4, 1947 was made in settlement of a controversy arising out of a charge made by Olsco and Garrett that Camco had infringed the King patent.

28. Although Olsco and Garrett charged Camco and its co-licensees in 1947 with infringement of the King patent in three distinct ways, making and selling valves with a seal to protect the bellows, installing such valves in a certain system, and installing non-seal valves in a similar system, Camco admitted only so much of the charge as related to making and selling valves with a seal and specifically did not admit that any of its installations had infringed.

29. The license granted by the license agreement of June 4, 1947, by carefully phrased reiteration excludes use of the seal, but, although Olsco and Garrett had charged infringement of the system claims by Camco's installation, the license granted included these claims in the most general terms and was so granted without admission that any installation of Camco was within their scope.

30. It was the intent of the parties, and the effect of the license agreement of June 4, 1947, to license Camco as to valves of the sort shown on Exhibit "B" and any other gas lift valves that Camco might develop independently of Olsco and Garrett of the sort operated by pressure exerted on a bellows in which no seal is effected upon a predetermined distortion of the bellows from pressure acting on the surface thereof, for protecting the bellows against excessive distortion due to increases in pressure of the operating fluid beyond the pressure necessary to actuate the valve. Camco was given the right to make and sell such valves free of any applicable claims of the King patent and to install them free of any of the system claims of that patent. Olsco and Garrett thus completely protected their exclusive right to the seal they be-

lieved to be essential and Camco got freedom to go forward in the non-seal area with bellows valves free of threat from the King patent.

31. Camco has not since June 4, 1947 manufactured or sold or used any valve which includes a seal to protect the bellows.

32. At least from June 4, 1947 to January 6, 1956, when the charge of infringement underlying the present action was first made, plaintiff or its predecessors kept themselves reliably, and with reasonable promptness, informed of the structure of Camco's valves and the manner of their installation, through Camco's publications and through the efforts of their own sales and engineering personnel.

33. Whenever plaintiff or its predecessors had any serious question about their rights with respect to any of Camco's operations, the matter was raised formally in writing.

34. Plaintiff, at the trial, gave the following particular bases for its present contentions that the valves now manufactured and installed by Camco are not within the permission of the license agreement of June 4, 1947:

(a) Camco valves have not always been installed as described in the Note on Exhibits A and B to the license agreement of June 4, 1947, but have been installed in series in settings in which the bellows of the valves have been charged to different pressures;

(b) Some Camco valves now include a cushion-rod and bellows-adapter, silicon-fluid-filled dash pot within the bellows which has a dampening effect upon the movement of the bellows;

(c) Some Camco valves now are equipped with attachments for installation in the McGowen and Moore retrievable mandrels;

(d) Some Camco valves now include integrally built-in check valves;

(e) Some Camco valves now include only a gas-charged bellows as the loading and pressure-responsive elements thereof, in place of the gas-charged bellows assisted by spring which compromises the corresponding elements of the valve in Exhibit B to the license agreement of June 4, 1947; and

(f) Some Camco valves now include a "balanced stem" feature reducing the opening effect of tubing pressure on the area of the valve that is exposed to that pressure when closed.

35. Plaintiff or its predecessors first had, or in the exercise of reasonable diligence should have had, knowledge of the Camco valves upon which it bases its contentions tabulated in Finding 34 on or about the following correspondingly tabulated dates:

(a) 1949;

(b) late 1954 or early 1955;

(c) April 11, 1951;

(d) 1949;

(e) Sept. 14, 1954; and

(f) 1951.

36. Plaintiff or its predecessors first effectively notified defendant of its charge that the Camco valves upon which it bases its contentions tabulated in Finding 34 were not covered by the license agreement of June 4, 1947 on the following correspondingly tabulated dates:

(a) After filing of the complaint;

(b) By the notice letter of January 6, 1956;

(c) By the notice letter of January 6, 1956;

(d) During the trial;

(e) After filing of the complaint; and

(f) After filing of the complaint.

37. Suit was first filed for infringement of the King patent against W. C. Carlisle et al., Civil Action No. 5884, in the United States District Court for the Southern District of Texas, Houston Division, in December of 1950. Mr. Mills, then president of defendant, had knowledge of this. For that, the King patent was introduced by counterclaim on March 6, 1953 in the Civil Action of Bryan v. Garrett Oil Tools, Inc., 5 Cir., 245 F.2d 365.

38. At least until the dispatch of the notice letter of January 6, 1956, plaintiff had made no reasonable effort to notify defendant that plaintiff and its predecessors did not accord the usual meaning to the word "similar", but, instead, took plaintiff's present position that the word means "substantially just like Exhibit B".

39. At least since June 4, 1947, Camco has openly and notoriously conducted a continuous program of improving its valves in design, construction and material without at any time adopting a seal to protect the bellows against excessive pressures acting upon the surface thereof, in the belief that all such improvements were within the scope of the grant of the license agreement of June 4, 1947. No reasonable businessman in the gas lift industry in 1947 would have accepted a patent license which would materially restrict such a program.

40. The King patent in suit relates to the gas lift equipment by means of which well fluids including oil are artificially produced by injecting gas under the liquid products at a level in the well beneath the surface so that the gas forces the liquids from the well.

41. Prior to his invention, King was confronted with a three-fold problem: (1) to provide a gas lift system capable of control from the surface to open and close one of a series of valves in a well selectively, to produce the well to depletion with an acceptable gas-oil ratio; (2) to accomplish this by remote control without a mechanical linkage between the valves and the surface; and (3) to provide a pressure charged valve with a sensitive bellows control, for accomplishing the above, which will open quickly, but with a dampening means for preventing too violent an action and which may be used under severe well conditions.

42. The need for an improved gas lift system and valves for use therein satisfying the above-mentioned requirements had existed since the early days of gas lift as shown by the McEvoy patent 906,773 issued in 1908 and Mr. Aucoin's article. Numerous patents had issued and articles had been written in this field of inventive activity between 1908 and 1940, and during this period various inventors and authors, including McEvoy 906,733, Archer 1,687,317, Guiberson 2,-188,656, Burke 1,803,837, Aucoin, Cloud, Osgood and Wilson Supply Company, had made statements showing that they were aware of the problem and seeking a satisfactory solution thereof. Their efforts to find a solution to one aspect of the problem (surface control) invariably resulted in a sacrifice of the other aspects (elimination of mechanical controls and reliability of opening and closing the valves). Until King's invention, no completely satisfactory solution was found where a well could be depleted with a given installation.

43. The first successful solution of the three-fold problem outlined above is found in the King patent.

44. There are three novel concepts on the part of King involved in the claims here in suit:

A. To provide a series of gas lift valves in a well set to open at succeedingly higher pressures with the lowest pressure valve located at the lowest elevation, with means to inject a predetermined *amount* of gas into the well as a charge to control the opening and closing of the valve or valves that will open by the pressures occurring due to that charge. The novel combination of elements for achieving this new result is expressed in claims 5, 6 and 7 of the King patent. It is not shown in any of the prior art.

B. To provide a series of gas lift valves in a well each having a bellows or expansible member as a pressure sensitive element and the bellows of each valve having pressure charges varying progressively from a high pressure at the top to the lowest pressure at the lowest valve. The novel combination of elements for achieving this new result is expressed in claims 10, 11 and 13 of the

King patent. It is not shown in any of the prior art.

C. To provide an improved gas lift valve with a bellows as the sensitive element, which, when the valve starts to open is instantaneously subjected to an increased opening force, with a damping baffle means for preventing a too violent opening action due to this increased force. The novel combination of elements for achieving this new result is expressed in Claims 4, 8 and 9. It is not shown in any of the prior art.

45. As to 44A above, the suggestion of step down in opening pressure is old in the art in continuous flow as shown in McEvoy 906,753 and Bryant 2,008,172. King, however, was the first in the basically different intermittent flow system to control the opening of selected valves by introducing a predetermined *amount* of gas as distinguished from trying to maintain a certain *pressure* in the well that would keep a selected valve open. King employed a predetermined *amount* of gas to serve a dual function, namely, to determine the amount of well fluids that will be produced and to open selectively the particular valve best suited to produce this amount of well fluids.

46. As to 44B above, the use of pressure charged bellows in valves had been suggested, as in Burke 1,803,837. However, King was the first to provide a plurality of these in a well with a step down in the pressure charge within the bellows with the lowest pressure valve at the bottom. It is this particular combination that has proven so very successful in advancing the gas lift industry.

47. As to 44C above, it was old to use dampeners in regulators, as in McDonald 2,211,068, Grove 2,212,709, Toussaint 2,234,304, Mock 2,376,711 and others, to prevent chattering due to surges in line pressure or to produce a time delay as in the repeating fuse of Schultz 2,210,-502. However, King was first to use the dampener to control the acceleration of opening of a valve. This was required where the opening force increased once the valve started to open, to prevent too violent an action and thereby to increase the life of a bellows. King was also the first to apply the dampener to a valve which discharges gas into a column of liquid, thereby instantaneously equalizing the pressure across the valve member which otherwise would cause very rapid acceleration of the opening movement and produce a too violent an action. Thus, the function and physical relationship of the parts as used by King were entirely different from those of the prior art dampeners.

48. Of all the art urged by defendant against claims 5, 6, 7, 10, 11 and 13, those most seriously relied upon by defendant are McEvoy, Chapman, Burke, Grisham and Bryant. These were all considered by the Patent Office with the exception of Grisham. Grisham was considered by the Court of Appeals for the Fifth Circuit as was McEvoy and Bryant as to certain of these claims. This set of circumstances strongly enhances the statutory presumption of validity of these claims.

49. Claim 10 contains a more specific statement of the elements of claim 11 and the additional element of "Means for applying gas under pressure to said valves to cause the gas to enter the flow string." It is, therefore, entitled to the same strong presumption of validity.

50. Since the advent of the King patent the gas lift industry has grown from a losing proposition at the time Mr. Cook took over the Gas Lift Corporation in 1940 to a total annual business for all companies of $7,000,000 or $8,-000,000. For a period of years it has increased annually at the rate of about 25 or 30 per cent per year. The old mechanically controlled wire line valves of Nixon, which offered the best commercial practice prior to King, were quickly rendered obsolete by the King valve and system. About 80 per cent of the valve business of the two largest suppliers of gas lift valves is of the type employing a step down in opening pressure and of surface controls for operating the valves.

51. Defendant, Camco, Incorporated, admits that it has within six years prior

to the filing of this suit manufactured, sold, installed and caused to be installed many valves of each of the types shown on Pl's. Exs. 48 through 60. It is stipulated that a series of each of such valves was installed in single wells and the valves had bellows charged with gas pressure, where the top valve had the highest gas pressure and the lower valves had successively lower gas pressures in the bellows. The differential adjustment of the valves of a setting was made by the different gas pressures in the bellows rather than by the spring adjustment. Some of Camco's valves designated as the "K" series, had no spring in them at all. Such installations structurally and functionally meet all of the terms of claims 10, 11 and 13 and accomplish the same result.

52. Some of the installations mentioned in Finding 51 had additional equipment including a motor valve, a time cycle controller for opening and closing the motor valve and a maximum pressure sensitive Bourdon tube cutoff or regulator. The latter was connected between the well casing and the time cycle controller for closing the motor valve.

53. Some of the installations mentioned in Finding 51 had the additional equipment mentioned in Finding 52, but the Bourdon tube maximum pressure regulator was connected between the well tubing and the time cycle controller. In these installations the Bourdon tube cuts off the supply of injection gas when this pressure within the tubing reaches a predetermined maximum which causes the rise in tubing pressure to the maximum cutoff pressure.

54. Some of the installations mentioned in Finding 51 had as additional equipment a time cycle controller without the Bourdon tube maximum pressure regulator. In these installations the controller with the particular source of gas present at the well was admittedly effective to determine "the injections per day and the *amount* of pressure gas applied to the gas lift well." The source of pressure at such wells is for all practical oil field purposes relatively constant due either to the type of gas source, upstream pressure regulators, the use of accumulation chambers, or the use of surface chokes. The function of the upstream pressure regulator, the accumulation chamber of the choke is to iron out pressure fluctuations to thereby provide a constant pressure or flow rate. Such surface control is the equivalent of the mechanisms of the King patent, Figs. 1 and 5, for providing a constant rate of flow within the meaning of claims 5, 6 and 7. A momentary fluctuation in pressure, analogous to the lights dimming when a refrigerator starts at home, has no practical effect upon the operation.

55. For practical oil field purposes, each of the installations described in Findings 52, 53 and 54 contain the structural and functional equivalent of a "means to introduce a predetermined amount of pressure fluid," etc., of claims 5, 6 and 7 and of the two such means shown in the King patent drawings Figs. 3, 4 and 5.

56. In the installations of Findings 52, 53 and 54, the time cycle controller and associated devices were in fact sufficiently accurate to cause the wells to produce satisfactorily from the working valve. The defendant received no complaints from customers that the wells did not perform satisfactorily from both the standpoint of making the allowable with a satisfactory gas-oil ratio and the standpoint of working from the proper valve.

57. For all practical purposes the equipment used at the surface controlled the injections of the pressure gas and the amount of each charge of gas to the well within oil field tolerances to determine which valve of a series of valves would open with each gas injection.

58. For all practical purposes the surface control equipment controlled the amount of each gas injection so as to produce the wells at a proper gas-oil ratio.

59. Certain of defendant's valves have contained a dampening mechanism as illustrated in the green colored

mechanism within the bellows of Pl's. Ex. 59. In this mechanism the depending green part, called the cushion rod, remains stationary and the green cylinder moves up and down as the valve opens and closes. The main portion of the pressure dome is extended into the white space beneath the lower end of the cushion rod by the circular opening or clearance between the rod and cylinder. Liquid fills this space and has to pass through this circular opening when the valve opens and closes. This provides a retarding or dampening of the movement of the valve to prevent too violent an action.

60. In both the defendant's dampener and that of the King patent, a chamber that is of small volume is segregated from the relatively large volume of the main portion of the pressure dome, but there is communication between them through a leak port. Movement of the bellows adapter, in each instance, causes a change in the volume of the isolated chamber to change the pressure therein relative to the pressure within the main reservoir. It is only by leakage of fluid through the leak port that the valve functions properly to open or close.

61. The defendant's valves that have the dampener meet functionally all of the elements of the King patent claims 4, 8 and 9 and have definitely added to the life of the bellows in the valves. These valves include:

| Pl's. Ex. No. | Camco Type |
|---|---|
| 48 | CK |
| 49 | AK |
| 50 | RC |
| 51 | RH |
| 52 | H |
| 53 | C |
| 54 | RCF |
| 58 | BK |
| 59 | C |

Conclusions of Law.

1. This Court has jurisdiction of the parties.

2. This Court has jurisdiction of the cause of action alleged in the complaint under the Patent Laws of the United States.

3. This Court has jurisdiction of the cause of action alleged in the first counterclaim by virtue of the diversity of citizenship of the parties and the amount in controversy, and this action is governed by the substantive law of the State of Texas.

4. This Court has jurisdiction of the cause of action alleged in the second counterclaim under the Patent Laws of the United States by virtue of the Federal Declaratory Judgments Act of 1934, 28 U.S.C.A. §§ 2201, 2202.

5. Judgment in favor of defendant on the first counterclaim requires dismissal of the complaint and the second counterclaim.

6. The license agreement of June 4, 1947 licenses defendant to make and sell and to install in accordance with any system claim of King United States Letters Patent No. 2,339,487 each of the valves listed in Finding of Fact 11.

7. Judgment for defendant on the first counterclaim should be entered declaring the substance of Conclusion of Law 6.

8. The plaintiff has been guilty of laches for a period greater than the 4-year statute of limitations of Texas governing contract claims in asserting its present contention that the license agreement of June 4, 1947 should be so construed as not to license defendant to make and sell and to install in accordance with any system claim of King United States Letters Patent No. 2,339,-487 each of the valves listed in Finding 11, and is barred by such laches from now making that contention.

9. The defendant is estopped by the terms of the license agreement of June 4, 1947 from contesting the validity of King United States Letters Patent No. 2,339,487 so long as the license agreement of June 4, 1947 continues in full force and effect.

10. The complaint and the second counterclaim should be dismissed.

11. Claims 4, 5, 6, 7, 8, 9, 10, 11 and 13 of the King patent comply with the patent statutes, are not anticipated by the prior art, and are valid.

12. The above claims are entitled to a reasonable breadth of construction, including a range of equivalents commensurate with the novelty of the inventions described in the patent.

13. The claims express the novel concepts constituting the gist of King's invention and such concepts are set forth in terms of a combination of elements, and their cooperative physical and functional relationship.

14. William R. King is the first inventor of the subject matter claimed in said King patent 2,339,487.

15. Defendant has installed and caused to be installed, its valves, as shown on Pl's. Exs. 48 through 60, with different pressure charges within the bellows, so that the top valve was adapted to open at the highest pressure and with the lower valves adapted to open at succeedingly lower pressures, and if it were not for the license such activities would have constituted infringement of claims 10, 11 and 13.

16. The activities of defendant in making the installations mentioned in conclusion 15, that employed, in addition, defendant's time cycle controller and the Bourdon tube maximum pressure regulator connected between the well casing and the controller would have infringed claims 5, 6 and 7 were it not for the license.

17. The activities of defendant in making the installations mentioned in conclusion 15 that employed, in addition, defendant's time cycle controller and the Bourdon tube maximum pressure regulator connected between the well tubing and the controller would have infringed claims 5, 6, and 7 were it not for the license.

18. The activities of the defendant in making installations mentioned in conclusion 15 that employed, in addition, defendant's time cycle controller and a source of gas at the well of constant pressure within practical oil field tolerances would have infringed claims 5, 6, and 7 were it not for the license.

19. The valves listed in finding of fact 61 are the full equivalent of claims 4, 8, and 9 and defendant's manufacture and sale of these valves would have infringed these claims were it not for the license.