254 F.2d 198
 U. S. INDUSTRIES, Inc., Appellant and Appellee,
v.
OTIS ENGINEERING CORPORATION and Otis Pressure Control, Inc., Appellees and Appellants.
OTIS ENGINEERING CORPORATION and Otis Pressure Control, Inc., Appellees and Appellants,
v.
U. S. INDUSTRIES, Inc., Appellant and Appellee.
 No. 16528.
 United States Court of Appeals Fifth Circuit.
 April 8, 1958.
 Rehearing Denied August 6, 1958.
 
 James T. Wright, Houston, Tex., Thomas E. Scofield, Kansas City, Mo., William C. Dixon, Los Angeles, Cal., Dyche, Wheat & Thornton, Houston, Tex., for appellant and appellee, J. W. Hassel, Jr., Dallas, Tex., of counsel.
 E. Hastings Ackley, Dallas, Tex., Oscar A. Mellin, Mellin, Hanscom & Hursh, San Francisco, Cal., for appellees and appellants.
 Before RIVES, BROWN and WISDOM, Circuit Judges.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 This appeal tests whether the District Court, on findings made after a trial at which there was considerable testimony, in person and by deposition, as well as the usual bulk of documents typical of this litigation, was correct in holding King patent No. 2,339,487 valid but not infringed. This clear-cut decision momentarily put an end to a complex controversy, since revived here, in which to Patentee's[1] claim of validity, infringement, and estoppel to deny validity, the alleged infringer[2] retorted in kind with the traditional fluid defenses of validity, noninfringement, monopolistic abuse of the patent monopoly and violation of federal anti-trust statutes.
 
 
 2
 This is another of the many suits[3] reaching here involving the important field of gas-lift devices for oil well operations. More than that, it presents once again the same patent. King 487, dealt with in Bryan v. Garrett Oil Tools, Inc., 5 Cir., 245 F.2d 365, 371. Except for one claim (No. 11) which Patentee insists, but Otis denies, is also for a "valve" claim for a valve structure per se, and as such is infringed by the Cummings control valve, the controversy[4] relates to the claims (5, 6, 7) describing the "system" of reverse loaded valves with surface control mechanism.
 
 
 3
 As we pointed out in our former decision, 245 F.2d at page 374, King 487 covers both "valve" and "system" claims. The valve is of little importance here, but in view of frequent parental boasting in its behalf, sometimes as though its presence is enough to convert old into new, ancient into novel, we mention it briefly. It is a flow valve structure to be affixed on the outside of the flow string (tubing). It is in the annular space between the casing and the tubing. When gas pressure in the annulus exceeds the set pressure of the valve, it opens allowing the escape of gas (or liquids) through the valve into and up the tubing. In place of a spring-loaded or weight-loaded valve, this structure was a gas pressure-charged valve. A predetermined charge of gas pressure was hermetically sealed behind a bellows which holds the valve member seated. It was, is, and has to be conceded that a gas pressure-charged valve was old in the art.
 
 
 4
 The "system" claims cover an apparatus by which flow control valves, whether gas pressure-charged, spring-loaded, or otherwise, and regardless of manufacturer are installed on the tubing in series. The flow control valve nearest the surface is set to open at the highest pressure and each succeeding valve from the top to bottom is set at a pressure somewhat lower than the valve immediately above. The purpose of this arrangement is to assure positive unloading of the liquid in the annulus (either altogether or to the static level) by sequential operation of the valves by gas pumped into the annulus from the surface in controlled amounts and at predetermined pressures. Once the well is unloaded, it may be produced by the gas-drive introduced from the annulus into the column of oil in the tubing at the particular selected valve of the series. For reasons which are more fully developed, the heart of King 487 is the disclosed methods by which gas in controlled amounts and at predetermined pressures is introduced.
 
 
 5
 The installations by Otis, or its customer-users, which are claimed to infringe have the series of control valves, here the Cummings type, set at successively lower pressures from top to bottom. The difference between the two is the arrangement at the surface. Where King 487 calls for both volume controller and intermitter, Otis uses but a timer. Whether that difference is a difference at all, is one in fact, or if in fact, is one in patent law, is a crucial one. The District Court held it was all three. Since infringement is a question of fact, Georgia Kaolin Co. v. Thiele Kaolin, 5 Cir., 228 F.2d 267; Fritz W. Glitsch & Sons, Inc., v. Wyatt Metal & Boiler Works, 5 Cir., 224 F.2d 331; Jeoffroy Mfg. Inc., v. Graham, 5 Cir., 206 F.2d 772; cf. Southern States Equipment Corp. v. USCO Power Equipment Corp., 5 Cir., 209 F.2d 111, that finding comes here with the buckler and shield of Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A., Lumbermen's Mut. Casualty Co. v. Klotz, 5 Cir., 251 F.2d 499.
 
 
 6
 Unwilling to leave to patentee the role of pursuer, unsatisfied with a decree that exonerates it for the past, unsure what the adversary's licensing practices might do to it and its customers in the future, and undaunted that we have already spoken on the subject, Otis urges that we should declare the Judge to have been wrong in presumably heeding us, and here determine that King 487 is invalid.
 
 
 7
 In assaying validity (and infringement) of King 487, Otis asserts that the patent has a narrowly circumscribed field for several reasons. The use, for example, of a single flow control valve (that is, not in series) even with an intermitter would not be covered. Such an apparatus seems literally anticipated by Guiberson 2,188,656, and in any case, all of the claims here[5] speak in terms of a series of valves. Likewise, a series of flow control valves set at reverse loading pressures but without an intermitter or surface volume control regulator mechanism would not be covered. This would be a literal application of Bryant 2,008,172.
 
 
 8
 This leads Otis to argue that (1) since it may use an intermitter on a single valve so that gas is intermittently introduced and (2) since it may install as many valves with reverse loading pressures as desired to operate under a continuous pressure supply of gas on the annulus, the effect of which would be to unload the well or lift the fluid in the tubing (even though there would be a waste of gas), there is no real novelty or invention in adding the old device of an intermitter to a series of flow control valves. While the matter is pertinent from the standpoint of infringement, we think, however, that this is not now open in view of Bryan v. Garrett Oil Tools, Inc., supra, in which validity was sustained.
 
 
 9
 It is plain from Bryan v. Garrett Oil Tools, Inc., 246 F.2d at page 371 et seq., that in sustaining the validity of the claims, note 5, supra, of King 487, we did so only by giving a carefully circumscribed construction to those claims. This was so because of the familiar rule that "the claim of a patent must be read in the light of the invention disclosed and cannot be given a construction broader than the teachings of the patent as shown by the drawings and specifications. Ford Motor Co. v. Gordon Form Lathe Co., 6 Cir., 87 F.2d 390, 392," Blanc v. Curtis, 6 Cir., 119 F.2d 395, 397, as well as to avoid anticipation. Both McEvoy 733 and Bryant 172 taught[6] the principle of reverse pressure loading[7] in which a series of valves were disposed with pressures set at progressively lower levels from top to bottom. We distinguished King 487 and thus avoided anticipation because neither of these, as does King, prescribed any mechanism for "the introduction of gas in controlled volumes and at predetermined pressures." Bryan v. Garrett Oil Tools, Inc., supra 245 F.2d at page 373. This was essential since only by "* * * a careful control of the amount of introduced gas [was it] possible to determine which of a series of spaced pressure sensitive valves should open" and only by "appropriate direct or indirect control of the gas pressure [was it] possible to keep the well operating at a particular valve or at progressively lower levels, in order to achieve the highest efficiency and optimum gas-oil ratios with given speeds of production and extraction." Id., 245 F.2d at page 372. The novel and patentable improvement over the prior art came from the use of the old concept of a reverse pressure installation with specified loaded valves "and a surface control for the admission of pressure gas to determine which valve is to be operated at a given time," id. at page 375, by "a method of supplying pressure gas in controlled amounts at predetermined pressures."[8] Id. at page 373.
 
 
 10
 The disclosures of King 487, as thus construed, showed that this was to be accomplished by the use, in combination, at the surface of two general types of devices. These were (a) a timer, sometimes an intermitter and (b) a volume controller or, its substantial equivalent, a pressure regulator.
 
 
 11
 The timer-intermitter is substantially a clock-driven mechanism which opens the main valve from the pressure gas supply line to permit it to flow into the annulus. It can be adjusted in a variety of ways to permit the valve to open and close at given cycles and to remain open for specified times. It operates, however, wholly independent of the pressure built up in the annulus for gas does not enter the annulus even though the pressure is below the desired point, nor does the supply of gas to the annulus cease if the pressure is built up in it to a point beyond that desired. It is only if the pressure on the main gas supply line remains constant and conditions in the well itself, such as the rate or kind of flow out of the formation into the tubing, likewise remain unchanged, that, for any given time, the amount-volume and pressure would be predetermined through the use of such an intermitter[9] alone.
 
 
 12
 Where, however, an intermitter is used, as King 487 discloses, in conjunction with either a volume controller or a pressure regulator, this condition can be achieved. Either of these two devices is on the main pressure gas supply line between the valve opened or closed by the intermitter and the point of entrance into the annulus. In the volume controller the rate of flow is determined by the differential pressure across an orifice plate.[10]
 
 
 13
 Where a maximum pressure regulator is used in lieu of the differential pressure volume controller, it likewise works in conjunction with the intermitter but is set to control the maximum pressure which can be applied to the annulus. That the intermitter is not alone sufficient is shown by the fact that one of the purposes of the pressure regulator mechanism is to interrupt introduction of gas into the annulus even through the timer valve is still open.[11]
 
 
 14
 As to three of the claims (5, 6 and 7), all of which are involved here, we said that "the trial court could and did find that the King '487 patent * * effectively claimed this invention and that this particular combination and application of separate devices (some new, some old) was a patentable advance over the prior art." Bryan v. Garrett Oil Tools, Inc., supra at page 373. As a combination all elements disclosed are deemed to be material. Haynes Stellite Co. v. Osage Metal Co., 10 Cir., 110 F.2d 11. The omission of a single element avoids infringement unless, of course, that which remains does all that the former combination did. Eames v. Godfrey, 1 Wall. 78, 68 U.S. 78, 79, 17 L.Ed. 547; Aleograph Co. v. Electrical Research Products, Inc., 5 Cir., 55 F.2d 106; Getty v. Kinzbach Tool Co., 5 Cir., 119 F.2d 249, 250; Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U.S. 399, 410, 25 S.Ct. 697, 49 L.Ed. 1100, 1105; Stewart-Warner Corp. v. Lone Star Gas Co., 5 Cir., 195 F.2d 645, 649.
 
 
 15
 By the pressure of the intermitter and the volume controller-pressure regulator, that which we held was the essential ingredient to the validity of the patent — "the introduction of gas in controlled volumes and at predetermined pressures" is fully met. With the intermitter only, this may or may not result depending upon variable conditions. If, for any one of a number of variables, the pressure remaining in the annulus at the end of the period in which the intermitter valve is closed is either greater or less than the desired level, the subsequent opening of the intermitter valve for the specified time does not assure that by the moment it next closes the predetermined amount or pressure will have been injected. If not, then the next cycle itself operates upon a condition other than that ideally and theoretically "predetermined." All that is assured is that when and as the intermitter opens often enough to build up a pressure in excess of that fixed on the specified control valve, gas will be admitted from the annulus into the tubing. But whether it will coincide with the optimum amount of fluid in the tubing or remain open a sufficient length of time to avoid waste of gas is uncertain. Without it the glowing[12] claims of this patent are unfulfilled.
 
 
 16
 Certainly, in affirming a holding of infringement by Bryan against King for infringement of the system patent, we did not do it on the assumption that Bryan used only an intermitter. We pointed out by words which bear emphasis that there Bryan "used a pressure controller with an intermittent timing device, both of which were well known prior to the King invention." Bryan v. Garrett Oil Tools, Inc., supra 245 F.2d at page 375.
 
 
 17
 Of course, we recognized that "amount" or "volume" are in reality synonymous, but we certainly did not hold that these two were synonymous with "pressure." To have said so would have done violence both to patent and Boyle's law. After distinguishing between quantity and pressure and after stating that the "correct amount of gas may be introduced from the surface by permitting flow at a controlled pressure for a given amount of time," we concluded "that, in substance, is what the Bryan surface control devices accomplish, and they enable the operator to exploit the well at a determined rate at a particular level and at high efficiency * * *." Id., at page 375. Unlike the condemned Bryan apparatus, there is, in the accused device here, but a timer-intermitter. There is no volume controller, nor is there a pressure regulator. As one of the essential ingredients to validity of these claims of King 487 is missing, this system patent, though valid, is not infringed.
 
 
 18
 Nor does validity of Claims 5, 6, 7 or 11 as a "system" compel a finding of infringement as to the structure of the Cummings control valve. The asserted novelty and invention of King 487 "valve" is the hermetically sealed gas pressure-loaded bellows arrangement. Of course, Claims 5, 6 and 7, note 5, supra, call for any type of control valve located in series with successively decreasing pressure settings.
 
 
 19
 When it comes to Claim 11 as a valve claim, there is considerable doubt that this discloses a patentable invention. Hermetically-sealed members are old in the art and the structure disclosed seems anticipated by Grisham 2,236,137. The distinguishing characteristics emphasized in Bryan v. Garrett Oil Tools, 245 F. 2d 365, 373, are not present in the description of Claim 11.
 
 
 20
 In any case, the only resemblance between the King and Cummings valves is the (a) result and (b) the fact that both are pressure-loaded, not spring or weight-loaded. In the King valve the force of the pressure-loaded gas on the protected bellows is in turn exerted against a plunger-type valve which opens or closes against a conventional seat. The Cummings valve is a sleeve type valve. There is a sleeve of rubber or resilient material around the circumference of a special mandrel having an outer circumference slightly larger than the tubing while its internal diameter is a continuation of the string tubing. There are slot openings in the outside shell of the mandrel. The rubber wrapper-like valve is held tightly against the port slots until the pressure built up in the annulus exceeds the gas pressure-loaded valve which likewise is in the circumference of the mandrel. As the annular pressure overbalances the gas-loaded pressure, the rubber fitting is depressed, opening a channel flowing along the side of the mandrel, up through a flexible non-return check sleeve valve and thence up through the opening into the tubing.
 
 
 21
 The Cummings valve is not substantially identical in structure. It is completely different in mode of operation. As such it does not infringe. For "it is well settled that infringement exists only when the accused device and the teachings of the patent in suit are substantially identical in structure, mode of operation, and results accomplished." Stewart-Warner Corp. v. Lone Star Gas Co., 5 Cir., 195 F.2d 645, 648. Price-Trawick, Inc., v. Gas Lift Corp., 5 Cir., 101 F.2d 134, 136; Getty v. Kinzbach Tool Co., 5 Cir., 119 F.2d 249. The fact that Claim 11 calls for a series of such valves does not give such hermetically-sealed valves a validity as to the valves per se either singly or in series.
 
 
 22
 As the contentions of monopolistic abuses of the patent monopoly were defensive in nature, it is not necessary to treat them in any detail. We think that as to the substantive grounds asserted as well as the existence or amount of damages, the findings adverse to Otis withstand any attack as clearly erroneous. FRCP 52(a).
 
 
 23
 The result is that the decree appealed from is in all things correct.
 
 
 24
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 U. S. Industries, Inc., a direct successor to Garrett Oil Tools, Inc., the prior owner of King 487
 
 
 [2]
 Otis Engineering Corporation and Otis Pressure Control, Inc. Otis purchased certain gas lift patents and some equipment from Thomas E. Bryan. Otis also acquired from Cummings, Inc. patent 2,642,889, issued June 23, 1953, covering a gas lift valve. It is this valve which was used by Otis in the accused installations. The District Court, in oral findings announced from the bench, stated that Cummings 889 was valid. This patent was in suit. The final decree makes no reference to it and its validity is not determined here
 
 
 [3]
 See e. g., Guiberson Corp. v. Garrett Oil Tools, Inc., 5 Cir., 205 F.2d 660, footnote 3, p. 662; Bryan v. Garrett Oil Tools, Inc., 5 Cir., 245 F.2d 365; Price-Trawick, Inc., v. Gas Lift Corp., 5 Cir., 101 F.2d 134; and Bryan v. Sid W. Richardson, Inc., 5 Cir., 254 F.2d 191
 As these cases illustrate, gas is put into the annular space (the space between the well casing and the tubing through which the oil flows) under pressure; control valves are then installed which, at predetermined pressures, permit the entry of gas from the annular space into the tubing either to lighten the column of oil by aeration or to lift a slug to the surface.
 
 
 [4]
 In Bryan v. Garrett Oil Tools, supra, Claims 1, 2, 3, 5, 6, 7, 11 and 13 were held valid
 
 
 [5]
 Claims 5, 6 and 7 are identical down to * of Claim 5. The added portion of 6 and 7 is set out below
 "5. A well-flowing device including a flow string, a series of unloading valves thereon set to open at successively higher pressures with the lower pressure valve at the lowest elevation, and means to introduce a predetermined amount of pressure fluid into the well as a charge to open such valve or valves as will open by the pressure occurring in the well due to the introduction of such charge.*
 "6. [Add at *] * * *, said means operating periodically so that if the first charge does not create a flow from the well that the second and subsequent charges will create a pressure which will overbalance the well and create a flow.
 "7. [Add at *] * * *, so that as the pressure is reduced as the well unloads, the higher valves will close and the flow occur due to the pressure fluid from the lower valve or valves."
 For Claim 11, to emphasize distinctive matters covered, we insert the letters in brackets [ ]:
 "11. A series of valves for use in admitting gas under pressure to a flow string and adapted to be spaced along said flow string,
 "[a] each valve including a hermetically sealed member expansible to close the valve and contractible to open the same and adapted to have its exterior subjected to the pressure of the gas to be admitted to the string,
 "[b] and an elastic pressure fluid within each of said members tending to expand the same,
 "[c] the pressures of said fluid in the various expansible members varying progressively from a relatively low pressure within the member on the valve adapted to occupy the lowermost position with respect to the flow string to a relatively high pressure within the member on the valve adapted to occupy the uppermost position."
 
 
 [6]
 
 These patents are: McEvoy 906,733
 Bryant 2,008,172
 
 
 [7]
 In addition to these patents, publications proffered by Otis and clearly admissible under 35 U.S.C.A. §§ 102, 282, were erroneously excluded by the Court and are properly before us for consideration. These three works, Petroleum Production Engineering by Lester Charles Uren, 1939, Second Edition, Volume II; Increasing the Recovery of Petroleum by Wentworth H. Osgood, 1930, First Edition, Volume II; Transactions of the American Institute of Mining and Metallurgical Engineers, Petroleum Division, Volumes 77 and 82, 1927, 1928 and 1929 reprinted Edition, Petroleum Development and Technology, while not disclosing a prior use of both a volume-pressure controller in conjunction with an intermitter, do show that one or the other had been used with control valves in series
 
 
 [8]
 File wrapper estoppel, only briefly summarized there, page 375, in connection with the rejected contention that "amount" or "volume" of gas were not synonymous terms, has special pertinence here. Present Claim 5, note 5, supra, then numbered 14 in the patent application, was "* * * rejected as reading in terms on * * * Bryant, or McEvoy." To that King urged "Claims 14 * * * inclusive are presented for reconsideration over the references applied thereto because it is not seen wherein any of these devices admit a predetermined volume of pressure fluid into the well as a charge to open the valve."
 This was spelled out in the specifications: "Another object of the invention is to control a timing mechanism for introducing pressure fluid in the flowing of the well, so as to control not only the volume of the gas introduced but the rate of introduction as well.
 * * * * *
 "Another object of the invention is to provide a timer mechanism to admit pressure fluid in the flowing of a well for a predetermined period while controlling the maximum pressure which is applied to the well as a function of the volume which is to be produced."
 
 
 [9]
 Certainly King never intended the intermitter to be the sole controlling device. In the file wrapper papers his Solicitor in reponse to these numerous rejections stated:
 "Guiberson [2,188,656] shows an intermitter D which is operated periodically, either manually or mechanically, and there is no thought whatsoever in this patent of operating this intermitter as a function of the rate of flow."
 
 
 [10]
 This mechanism is indicated in Figure 5 of the King patent and the Specifications page 2. If the rate of flow of gas resulting from the opening of the valve by the intermitter exceeds the desired rate, this differential pressure actuates a diaphragm in the control mechanism which, acting on the pressure chamber of the intermitter, causes the main valve to close
 
 
 [11]
 In this construction the timer will open wide and admit the pressure gas in the annulus until such time as the pressure builds up to the desired level whereupon the regulator operates to bleed off the pressure from the pressure chamber of the timer head. The timer thus stays open for a predetermined period, but the regulator is provided to limit the maximum pressure which is to be applied. This is disclosed in Figure 3 of the drawings and page 3 of the Specifications
 
 
 [12]
 The patent states "* * * the present invention contemplates a mechanism which can be adjusted so as to produce the predetermined allowable from the well and which will not produce more than this allowable and, at the same time, conserve the pressure fluid being used to flow the well
 "With present devices used for flowing wells, it is not uncommon to have a great waste of fluid pressure so that the gas-oil ratio of the well is very high, but with the present invention the gas-oil ratio can be reduced materially and positively controlled to produce the desired volume of liquid."