**U. S. INDUSTRIES, INC., Appellant,**

v.

**OTIS ENGINEERING CORPORATION, Appellee.**

**No. 17624.**

United States Court of Appeals
Fifth Circuit.

April 8, 1960.

Thomas E. Scofield, Kansas City, Mo., James T. Wright, Houston, Tex., Dyche, Wheat & Thornton, Houston, Tex., for appellant, Charles F. Potter, Spruiell, Lowry, Potter & Lasater, Tyler, Tex., of counsel.

Oscar A. Mellin, San Francisco, Cal., E. Hastings Ackley, Dallas, Tex., for appellee.

Before CAMERON, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

We have again for decision questions of validity and infringement of patents in the gas-lift field, the importance of which to the oil business is attested by the frequency with which we are confronted with such devices.[1] As in so many of these former cases, this one, too, finds Bryan and Garrett, or their respective assignees, as adversaries. Otis Engineering Corp. became the assignee of Bryan on May 12, 1956. U. S. Industries, Inc. is the corporate successor of Garrett. Although a new suit and hence a new appeal, it is a continuation of the suit determined in Bryan v. Garrett Oil Tools, Inc., 5 Cir., 1957, 245 F.2d 365. It directly involves the same Bryan patent 345[2] (Claims 4, 5, 6 and 7) and requires discussion of expired Bryan 918[3] both adjudicated in that opinion. Infringement requires treatment of the Camco side-pocket mandrel which, between Bryan and parties other than Garrett, was the subject of our decision in Bryan v. Sid W. Richardson, Inc., 5 Cir., 1958, 254 F.2d 191, concerning Howard 162 and McGowan 903.[4] The District Court held Bryan 345 valid and infringed (direct and contributory). We affirm on validity but reverse and modify in part as to infringement.

## I.

The District Court by pretrial summary judgment held as a matter of law that the prior determination of validity of claims 4, 5, 6 and 7 of Bryan 345, affirmed by our opinion, Bryan v. Garrett Oil Tools, Inc., supra, was binding as res judicata. Otis (the plaintiff) was a direct assignee of Bryan by an assignment which expressly referred to Bryan 345 and the patent controversy with Garrett and in elaborate detail allocated control direction and expense of the litigation. On the other side, the defendant, USI, in October 1955 became the direct corporate successor of Garrett. It is somewhat difficult to determine just what the position of USI is as

1. See, e. g., U. S. Industries v. Camco, Inc., 5 Cir., 1960, 277 F.2d 292; Bryan v. Sid W. Richardson, Inc., 5 Cir., 1958, 254 F.2d 191; United States Industries, Inc. v. Otis Engineering Corp., 5 Cir., 1958, 254 F.2d 198; Guiberson Corp. v. Equipment Engineers, Inc., 5 Cir., 1958, 252 F.2d 431; Bryan v. Garrett Oil Tools, Inc., 5 Cir., 1957, 245 F.2d 365; Guiberson Corp. v. Garrett Oil Tools, Inc., 5 Cir., 1953, 205 F.2d 660, 662, footnote 3; Price-Trawick, Inc. v. Gas Lift Corp., 5 Cir., 1939, 101 F.2d 134.

2. Patent 2,275,345 issued March 3, 1942, expired March 2, 1959.

3. Patent 2,145,918 issued February 7, 1939, expired February 6, 1956.

4. Howard et al. 2,664,162 application June 24, 1948, patent issued December 29, 1953, to Kenneth C. Howard, Harold E. McGowen, Jr. and Harold H. Moore, Jr. McGowen et al. 2,679,903, issued to Harold E. McGowen, Jr. and Howard H. Moore, Jr. June 1, 1954, application November 23, 1949.

to res judicata. In the trial court, it was the one who, on the basis of res judicata, moved to stay trial of this cause until final action in the pending appeal of Bryan v. Garrett Oil Tools, Inc., supra. But after that stay expired from our affirmance and trial was approaching, it renewed in elaborate pleading form this attack on validity. The trial judge rejected this by sustaining motions to strike answers raising such defenses. On the actual trial, the Court declined to permit further inquiry into validity but did allow USI to develop a full bill of exceptions which it brings forward into our record. It continues obliquely to argue these matters [5] resolved against its predecessor Garrett by our former decision. But this holding of validity of Bryan 345 is final on both the immediate parties and here on their respective direct successors.[6] Validity, as such, may not now be questioned. Of course, in assaying infringement the scope and application of the claims previously held valid become the proper subjects for proof and adjudication. Nash Motors Co. v. Swan Carburetor Co., 4 Cir., 1939, 105 F.2d 305, 310.

## II.

On infringement the District Court held that USI was guilty of:

(a) contributory infringement by making retrievable gas lift valves especially for and useful only in bypass mandrels (making up the infringing combination) and selling such valves knowing that they were to be used in the infringing combination;

(b) direct infringement by making and selling bypass mandrels knowing they were to be combined with retrievable valves to form the infringing combination; and

(c) direct infringement by making and selling the completed patented combination of a bypass mandrel and retrievable gas lift valve.

USI does contend that the Camco mandrel (and valves), as well as the type "S" valves [7] (which we later discuss briefly) do not infringe. But except as to these it makes no effort by brief to demonstrate why the other valves and mandrels specified in the Court's findings and judgment are not (a) the substantial equivalent of the Garrett WOBP valves held to infringe in Bryan v. Garrett Oil Tools, Inc., supra, or (b) the equivalent of the devices disclosed by claims 4, 5, 6 and 7 of Bryan 345. Our examination of the record on the issues adequately briefed convinces us that as to these other devices, there was ample basis for the finding of direct or contributory infringement as the case might be. They warrant and will receive no further discussion.

The case as it finally narrows down relates essentially to the Camco side-pocket mandrel. Basically the question is whether the Camco combination of a bypass mandrel and retrievable valve comes within the scope of these claims (4, 5, 6 and 7) of Bryan 345. If it does, two subsidiary, but important, questions remain: (1) does the making and selling by USI of gas lift valves useful only in the Camco mandrel, knowing they are to be so used, constitute contributory infringement? (b) does the act of USI in purchasing Camco mandrels from Camco, Inc. and then installing a retrievable valve of its own manufacture to complete

5. These issues may be summarized:
   (a) Bryan was not the first inventor, but Kyner was;
   (b) Bryan 345 is invalid as not invention over prior art and Bryan 918;
   (c) Bryan 345 is invalid because Bryan 918 exhausted the patentability of Bryan's invention.

6. Livesay Industries, Inc. v. Livesay Window Co., Inc., 5 Cir., 1953, 202 F.2d 378, 383.

7. The District Court's original findings of fact and conclusions of law. December 7, 1957, paragraph VII declared that valves S and SO when sold with or for use in bypass mandrels type V and V-2 infringed. By amended conclusions of law No. 5 further S type valves were specified "when used with a bypass mandrel." This was effectuated by the formal judgment to like effect, paragraphs 8, 9, 10, 11 and 13 and the injunction provision paragraph 14(e).

the patented combination for sale constitute a direct infringement in view of the license granted by Bryan to Camco, Inc.?

## III.

Gas-lift in production of oil is simple in its major objects and outline. Gas is injected under fixed or variable pressure into the annulus between the casing and the production tubing through which the oil is to flow to the surface. Through control valves, either single or in series, located in or affixed to the tubing, the gas enters the tubing at the sub-elevation desired and in the volume or at the pressure required. The effect is one of two things or combination of both. The gas aerates oil in the tubing and thus makes it lighter allowing the natural pressures of the well to lift the oil to the surface. Or the gas, as a slug, expands and pushes the column of oil up to the surface. The principal idea of utilizing gas (or air or fluids) was an old one as the early patents frequently cited in anticipation covering water wells reflect. So, too, were many of the mechanical elements—principally the control valve, whether spring, hydraulic, pneumatic or weight loaded. But between this well recognized idea that gas, through the use of well known control devices, was theoretically available as a source of production power and its actual realization were many practical problems encountered in oil well operations which challenged the inventive genius of skilled persons. The result has been that the novelty underlying patentable invention has most frequently come through combinations of many old elements to meet these practical problems.

So far as operation of the control valve was concerned, it was just as efficient that the valve was located in a housing outside of the tubing. And in the early days this was done. Improvements were made by which the valve housing was contained in a mandrel [8] so that, while the valve was situated within the interior of the expanded continuation of the tubing, it was still external (offset) to the main axis of the tubing. This did, of course, leave the tubing open and unobstructed either for flow of oil or for the free passage of production tools as might be required during the life of the well. But there was a serious objection to this. The valve had to be inserted into the mandrel and the mandrel had to be put into the tubing string at the surface. This meant that in the event of valve failure or the necessity of valve maintenance or pressure resetting, the tubing had to be pulled to the surface—a process costly in time and money. The quest, then, was for a method by which the valves could be inserted and removed without pulling the tubing. Here again the mechanical means for this were self-evident. For wire-line devices had long been known through which delicate operations could be conducted in a narrow hole thousands of feet below the earth's surface. The problem was not really how to insert or retrieve a valve. The problem had to do with the operability of the valve once in place. Whether the valve was sealed by a tapered valve seat as in Bryan 918 or by traditional O-rings with latching devices as in the forerunners to Bryan 345, the inside, cross sectional area of the tubing was severely constricted by the valve and valve housing. This resulted in two things. The upward flow of oil was impeded with a like lowering in efficiency, and more important, the pressures of the oil moving upward through the valve structure caused the valve to be dislodged with conseqent damage to the valve, other well equipment, and a complete cessation of the gas lift operation. This was the problem which Bryan 345 set out to solve. In brief, the novelty was in the mandrel. It provided the customary housing for the valve in the center of the axis of the tubing. And then by bulges

---

8. "A mandrel, as the term is generally applied, is any specially designed structure that is threaded, top and bottom, to be screwed into and form a part of the tubing. Its outside diameter is generally somewhat larger than that of the tubing." Bryan v. Sid W. Richardson, Inc., supra, 254 F.2d at page 192.

in the sides of the mandrel, semicircular concentric spaces were provided as bypasses around the valve.[9]

As much an advance as this was, some of the old objections remained. With the Bryan 345 mandrel and valve, the opening in the valve housing was too small to pass valve units through for seating below the topmost control valve in the tubing string. This meant that in a series installation, the tubing had to be pulled to permit removal, renewal, repair or resetting of all similar valves below the topmost mandrel. More serious, the tubing was almost completely obstructed so it was impossible to use other production tools [10] without the costly pulling of the tubing. This was the problem which Howard 162 and McGowen 903 [11] set out to solve. The solution, in brief, was the Camco side-pocket mandrel in combination with the fitting tool. The Camco mandrel was shaped to provide a pocket over to one side into which the valve could be inserted or retrieved by wireline devices and, at the same time, the tubing was left completely open and unobstructed for oil flow and production operations.

### IV.

Bryan's successor (Otis) contends, and the District Court agreed, that Claim 7

of Bryan 345 reads literally on the Camco mandrel.[12] Otis further contends that if it does not do so from the plain words used, it most certainly does by the uncontradicted expert testimony of Schramm —one of its executive officers and head of its engineering department and thus a partisan in every sense of the word.

But in the light of the disclosures of Bryan 345, the state of the art, the difficulties sought to be overcome by Bryan 918 and Bryan 345 in contrast to Howard 162 and McGowen 903, we are of the opinion that the Camco mandrel is neither the literal nor substantial equivalent of the bypass feature of Bryan 345.

The Schramm testimony—opinion evidence as it frankly is—when properly analyzed neither compels nor permits a contrary view. It was, to begin with, largely a parroting of the words of claim 7 in its several elements, note 12, supra, with the expected conclusionary affirmance that, as to each element, it was the same. Likewise the opinion contained its own exception which either made the evidential process a bootstrap operation or assumed the very point in controversy. For in several different versions, the substance of the testimony was that *except* for the *shape* or the *form* of the mandrel,

9. Garrett's WOBP valves, found to infringe in Bryan v. Garrett Oil Tools, Inc., supra, had but one concentric bypass.

10. In Bryan v. Sid W. Richardson, Inc., supra, we pointed out that these operations "included swabbing, paraffin cutting, bottom-hole pressure survey, etc." 254 F.2d 191, 192, footnote 5.

11. These patents, see note 4, supra, were involved in Bryan v. Sid W. Richardson, Inc., supra.

12. Throughout the trial and in briefs here, the parties used Claim 7 as the standard of comparison. No suggestion is made by either that a different result would be required under either of the other claims 4, 5 or 6. Claim 7, with the individual elements stressed throughout this record being numbered in brackets reads as follows:

"In combination,
"[1] a well casing and a
"[2] string of tubing,
"[3] a fitting having a cylindrical body interposed within the said tubing adapted to receive a gas lift valve,
"[4] a valve removably disposed within the said fitting and
"[5] means on the said valve providing a seal therearound,
"[6] open communication between the said valve and the tubing thereabove,
"[7] passages providing a by-pass for fluid around the said valve and through the said fitting,
"[8] the said passages communicating with the interior of the said fitting at both ends and
"[9] ports arranged in the walls of the said fitting and valve between the said sealing means admitting gas pressures into the said tubing through the said valve."

it, in the rubric of the cases,[13] accomplished the same thing in the same way as the Bryan 345 bypass. The effect of this was for the expert witness to assume that significant differences in form were immaterial to the determination of the legal question of equivalence. But where the difference in form or shape or other physical characteristics is directly related to the solution of practical problems not previously sought to be solved by the device claimed to have been infringed, the difference, though in form or shape, may yet be significant.

■■■ Experience with patent cases demonstrates that seldom may the question be determined on the literal words of the claim. Independent Pneumatic Tool Co. v. Chicago Pneumatic Tool Co., 7 Cir., 1952, 194 F.2d 945, 947. This wholesome view has already had application to the benefit of Bryan in 345. For in our prior decision, we rejected Garrett's contention that since element [7] of Claim 7, note 12, supra, refers to "passages," exemplified in the specifications and drawings as passages on all sides of the valve housing, the Garrett WOBP device did not infringe since it had only a single passage. This was so even though, on that side of the mandrel, the passages could not, as required by element [8] be "communicating with the interior of the said [mandrel] at both ends." Bryan v. Garrett Oil Tools, Inc., supra, 245 F.2d at page 371. It has been many times pointed out that "where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement."

Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608–609, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 1102. Unfortunately, in the difficult process of arriving at a judicial determination, we may have few mechanical guides. We are reminded that "in determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents." Graver Tank & Mfg. Co. v. Linde Air Products Co., supra, 339 U.S. at page 609, 70 S.Ct. at page 857, 94 L.Ed. at page 1102. The consequence, of great importance in this case, is that "consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform." Graver Tank & Mfg. Co. v. Linde Air Products Co., supra, 339 U.S. at page 609, 70 S.Ct. at page 857, 94 L.Ed. at page 1103.

This is important here. For we pointed out in Bryan v. Garrett Oil Tools, Inc., supra, 245 F.2d at page 371, that "the novelty of the Bryan '345 invention lies in the use of by-pass passages to reduce the upward oil pressure on a removably seated valve * * *." Reading the patent as a solution to a specific narrow problem was further emphasized when we said that the Bryan 345 "design was patentable because of its novel solution of the particular problem and Garrett's infringement lies in appropriating that answer to solve that very same problem." Bryan v. Garrett Oil Tools, Inc., supra, 245 F.2d at page 371. But this was not the problem which the Camco side-pocket mandrel sought to solve. With respect to this very device, we said in Bryan v Sid W. Richardson, Inc., supra, 254 F.2d

13. See Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 1102, a device infringes " 'if it performs substantially the same function in substantially the same way to obtain the same result.' Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147, 156. The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.' Union Paper-Bag Machine Co. v. Murphy, 1878, 97 U.S. 120, 125, 24 L.Ed. 935, 936."

at page 192, that the problem was "how to install valves which would be (a) removable selectively without pulling the tubing while (b) leaving the tubing open for operations." Patentable novelty resulted not from the effort to solve the problem of the upward flow of oil or the dislodgement of the control valve. The novelty was the "combination of co-acting elements of a sidepocket mandrel and shifting tool which left open the tubing bore and yet had full selective retrievability of flow control units." 254 F.2d at page 194.

Each was designed to meet a specific and different problem and mechanically they are quite dissimilar. In Bryan 345 the mandrel is somewhat larger in diameter than the well tubing. Concentric with the axis of the mandrel is a tube having a seat for receiving the control valve. Bypass or auxiliary passages for the flow of oil around the valve and valve seat member are provided. In the enlarged section of the mandrel several passages paralleling the seated valve are provided through which there can be a substantially unchecked flow of oil. The Camco mandrel, on the other hand, is quite different. It is essentially a rather long joint of pipe providing a longitudinal area that is a continuation, without constriction or obstruction, of the well tubing. The mandrel is larger at its bottom end. The valve is offset in a tube at the bottom end of the mandrel. This side pocket in which the valve is inserted is the lateral enlargement or bulge along one side of the mandrel. The side of the tubing closest to the center of the mandrel is a virtual continuation for the length of the valve of the production tubing. The valve is inserted into and removed from the side-pocket mandrel through a shifting tool. This permits selective removal of any one of a series of valves placed at different elevations. While providing complete selective retrievability of valves, this arrangement does not restrict the central bore of the tubing or the flow tube portion of the mandrel. Consequently, free passage of other oil well tools through the mandrel is permitted without disturbing the gas lift valve and without requiring the tubing to be pulled.

The passageway for oil through the Camco mandrel is a true combination of the tubing. It is not a bypass *around* the valve. For the valve is lodged in the side pocket completely to one side of the passageway. The witness Schramm, for his thesis, had to say, of course, that a continuation of the main bore of the tubing alongside the pocket holding the valve was, as element [7] of claim 7, note 12, supra, specifies, "passages providing a *by-pass* * * * *around* the said valve and through the said * * *" mandrel. (Emphasis added) But this led him to the inescapable admission that, on such an interpretation, the by-pass element in 345 would read on several old and prior patents.[14]

---

14. See, e. g., Bryan 2,137,441 issued November 22, 1938, application October 3, 1936. The valve in Bryan 441 is in the blister on one side of the mandrel and leaves the tubing bore completely unobstructed. The specifications described one of the objects "to provide a fitting forming a part of the tubing of a well and providing a chamber out of the direct tubing opening for accommodating a valve * * * thus providing an unobstructed tubing opening while at the same time providing for the operation of the valve at its fullest efficiency." Claim 4 describes it as "a fitting adapted to form part of a well tubing, said fitting having a passageway therethrough in substantial alignment with the tubing to which it is to be connected, and having a laterally disposed valve chamber * * *." Substantially this same language is repeated in claims 5, 6, 7 and 16. Somewhat comparable is Bryan 1,840,694 issued January 12, 1932; as is true of at least one embodiment (figure 5) of Boynton 1,985,-973 issued January 1, 1935; and also Kyner 2,210,247. Of the latter the witness said that the by-pass element [7] of Bryan 345 reads on the Kyner blister-type mandrel as he "would say that the one element of the claim describes a By-Pass such as shown in the Kyner device." The witness was subsequently recalled to retract this testimony by pointing out that these earlier patents concerned nonretrievable valves. That obvi-

A continuation of the tubing is not a bypass. It is *the* passageway and not a way around the valve.[15]

The conduct of Bryan is also a factor of considerable significance. This "self-professed father of the gas lift art," 254 F.2d 191, 192, is no novice either to gas lift operations, the prosecution of patents before the Patent Office resulting in the issuance of over 25 patents to him, or the maintenance of patent litigation in the role of pursuer, pursued, or both. When this experienced inventor and litigant was sued in Bryan v. Sid W. Richardson, Inc., supra, for infringement of the Camco mandrel device, his defense of invalidity of Howard 162 was not based on Bryan 345. Indeed, by a sort of double exposure, he denied novelty in Howard 162 and then asserted by a subsequent patent application that he was actually the discoverer of this great improvement.[16] It was only with respect to continuation patent McGowen 903, see note 4, supra, that Bryan 345 was asserted. Even then it was in company with Kyner 247 and others including those listed in note 14, supra, showing valve receiving sections outside the tubing or the axis of the tubing. Casting the same doubts on Bryan's present assertion that Bryan 345 covers the Camco side-pocket mandrel was also the dismissal of his counterclaim in the Richardson suit. Since the Camco mandrel

was essential to the novelty of the combination there sustained, Bryan 345 would have been both a good defense of anticipation and the basis for declaratory relief against Richardson notwithstanding the absence of any need for relief against Camco who held broad licenses from Bryan.

█ Finally, mention should be made of the narrow scope of this invention and the correlative range of equivalents. In the light of the slight advance of Bryan 345 over Bryan 918 as well as the accumulated art in the field, the novelty of Bryan 345 related to the by-passages *around* the valve placed within the bore of the tubing. The range of equivalents of a patent depends on and varies with the degree of invention.[17] Here the range is narrowly circumscribed to those devices which are not offset from, nor outside of, the continuation of the tubing bore.

█ Since the Camco mandrel is not the substantial equivalent of Bryan 345, there is no infringement, U. S. Industries, Inc. v. Otis Engineering Corp., 5 Cir., 1958, 254 F.2d 198, 204, either by the sale and installation of the mandrel alone or with fitted valves or in the sale of valves known to be intended for such use.

We therefore disapprove and reverse as to this phase.[18]

ous difference is irrelevant, however, to the effort to define a by-pass as the same as a main passageway.

15. Looking to other claims in the interpretation of those involved in the particular case, Bryan v. Sid W. Richardson, Inc., 5 Cir., 1958, 254 F.2d 191, at page 196, claim 8 of Bryan 345 expressed the fundamental mechanical difference. It speaks of "a fitting for supporting a gas lift valve within a string of tubing having a cylindrical main body providing a *continuous passage* therethrough of the *same diameter* as the said tubing * * *."

16. See Bryan v. Sid W. Richardson, Inc., 254 F.2d 191, at page 193 and note 7 which refers to Bryan application June 8, 1954, Serial No. 435117.

17. Cameron Iron Works, Inc. v. Stekoll, 5 Cir., 1957, 242 F.2d 17; Big "G" Distributing Co. v. Air Cleaner Service Co., 5 Cir., 1950, 179 F.2d 122; Hughes v. Magnolia Petroleum Co., 5 Cir., 1937, 88 F. 2d 817.

18. The result is that we reverse the District Court's action with respect to the Camco type mandrel we have discussed. Consistent with the trial court's treatment this will comprehend mandrels, valves for such mandrels and completed combinations. On the remand the District Court shall make appropriate determination and declaration of the particular structures or combinations thereof which, consistent with our holding, do not infringe. Such structures will then be excluded in any accounting for damages as well as the injunctive orders.

## V.

We think that modification is also required in the case of the S-type valves. The statute on contributory infringement,[19] of course, comprehends non-patentable items, such as gas lift valves, where the alleged infringer knows the item "to be especially made or especially adapted for use" as a component in the patented combination. 35 U.S.C.A. § 271 (c). But the statute significantly excepts an item which is "a staple article or commodity of commerce suitable for substantial noninfringing use" 35 U.S. C.A. § 271(c).

■ The statute prescribes its own standard in terms of commercial suitability. Here the record is uncontradicted that the S-type valves are normally and frequently sold for use in mandrels having no bypass arrangements. Various explanations are given which we need not elaborate. Since these S-type valves are frequently sold and are capable of use in mandrels having no bypass arrangement, they fall within the statutory classification of an article "suitable for substantial noninfringing use." Note 19, supra. Since such valves have that commercial utility, the manufacturer is entitled to make, sell and distribute and install them without regard to whether they will or might be used in a bypass mandrel.[20]

## VI.

We also consider that by virtue of a license agreement between Bryan and the supplier of the Camco mandrels that they became free items of commerce and were no longer the subjects of patent protection.

The District Court ruled that although Camco, Inc. had manufactured the mandrels under a valid license from Bryan and thus had a right to sell them to USI, USI did not have a right to resell them. We disagree.

In 1952 Bryan, then asserting that Camco and others were infringing Bryan 2,145,918 and 2,179,226, made a settlement in which he granted a license to Camco, Inc.:

"Bryan hereby grants to Camco, and to Camco only, a fully paid-up non-exclusive, non-revocable and non-assignable license to make, use and sell throughout the United States and all foreign countries under said Bryan patents * * * 2,275,345 * * *."[21]

This license agreement covered among other devices the Camco mandrel for which Camco, Inc. was licensed by Sid W. Richardson, Inc., the patentee in the patents then pending and later to be issued as Howard 162 and McGowen 903, note 4, supra.

The contract was, at it states, for a non-exclusive, non-assignable license. It expressly provided that the license was "non-transferable in whole or in part except * * * to the legal successors of Camco" and Camco was "expressly prohibited from granting sub-licenses under the license" therein granted.

To this contention Bryan responds that since the license to Camco forbids Camco to grant a sub-license or assign it in any way, Camco may not sell to others

---

19. 35 U.S.C.A. § 271(c) :
   "Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." See Lincoln Engineering Co. v. Stewart-Warner Corp., 7 Cir., 1937, 91 F.2d 757, 763, 764; Southern States Equipment Corp. v. USCO Power Equipment Corp., 5 Cir., 1953, 209 F.2d 111, 121.

20. We therefore reverse as to the "S" type valves specified in the District Court's decree. See note 7, supra.

21. The other patents listed were Bryan 2,145,918, 2,179,226, 2,137,411, 2,217,305, 2,255,648, 2,275,346 and Kyner 2,208,036, 2,210,247.

with the expectation that they in turn will resell the mandrels. When it does so, Camco is operating beyond the license and is itself an infringer. See Schrade v. Camillus Cutlery Co., D.C.N.D.N.Y. 1917, 242 F. 523, 524; St. Louis Street Flushing Machine Co. v. Sanitary Street Flushing Machine Co., 8 Cir., 1910, 178 F. 923, 927. Moreover, USI is charged with knowledge of Bryan's patent (assumed valid and infringed for the purposes of this discussion). Consequently, unless USI acquired some right by Camco's license, its acts in the sale of the mandrel—whether with or without valves installed—constitutes direct infringement. Further, the sale of valves having no substantial commercial suitability other than in the mandrels with the intention they may be used in Camco mandrels constitutes contributory infringement.

The defendant USI in the main asserts that this Camco license makes the situation analogous to that dealt with in Adams v. Burks, 1873, 17 Wall. 453, 84 U.S. 453, 21 L.Ed. 700, and United States v. Univis Lens Co., Inc., 1942, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408. Bryan insists these cases must be confined to license arrangements permitting only the sale of the complete patented article and not a mere component of a combination which must be sold in whole or not at all. See Eureka Co. v. Henney Motor Co., 3 Cir., 1937, 91 F.2d 708.

■ Of course, the question here is one of contract, not patent law as such. Storm v. United States, 5 Cir., 1957, 243 F.2d 708, 710–711; 69 C.J.S. Patents § 249, p. 770. For "a license is not an assignment of any interest in the patent. It is a mere permission granted by the patentee. * * *" Henry v. A. B. Dick Company, 1911, 224 U.S. 1, 24, 32 S.Ct. 364, 370, 56 L.Ed. 645, 654. While the Court did point out that since "a license passes no interest in the monopoly, it has

been described as a mere waiver of the right to sue by the patentee," Henry v. A. B. Dick Company, supra, 224 U.S. at page 24, 32 S.Ct. at page 370, 56 L.Ed. at page 654, a contract of license is and can be a most valuable and enforceable right. If it is finally determined that the licensee and his purchasers may deal with the Camco mandrels as items of free trade, it is not the allowance of a sub-license or an assignment prohibited by the settlement license contract. What it is is a determination that fairly construed, the contract grants such immunity.

■ As a contract, it certainly ought to be construed if possible to make it of practical utility. One of the most important things, especially in this gas lift field where litigation has kept up with the flood of inventions, is the necessity of giving some assurance to customers, oil companies and others, who purchase the devices for use.[22] Nor could buyers afford to buy. Not only would the buyer properly apprehend the likelihood of expensive infringement litigation, but he might find himself unable safely to purchase the valve when needed at a subsequent time from anyone other than Camco or Bryan. The problem from the buyer's standpoint becomes only more complex when considered in the light of the practical aspects of the oil industry with its widespread operations, large integrated companies and crews scattered over the face of the globe with little real hope (and no sense) of ever maintaining, in a shifting warehouse stock, a genealogy of mandrels and valves by company of manufacture, sale or supply. The result would be that Camco paying valuable consideration for the right to sell would have no buyers to whom to sell.

And yet, despite the unqualified power conveyed to Camco to *sell*, Bryan insists that this grant was "intended to apply

22. Bryan and his succession of eminent counsel would be the first to know this. Notice of infringement may fix the time for claiming infringement damages, 35 U.S.C.A. § 287. Bryan even asserted in

Bryan v. Sid W. Richardson, Inc., supra, 254 F.2d at page 198, that the giving of such notice to friendly customers was bad faith unless it were followed up with suits against the users.

only in such instances" that the sales of bypass mandrels without gas lift valves "were to [a] persons licensed to manufacture and sell the patented combination or to [b] persons who intended to fit Camco valves to the mandrels to complete the combination."

As the record is uncontradicted that the full consideration was received on the execution of the license agreement with no provision for continuing royalties payable to Bryan, it is difficult to see why it was either to Bryan's interest to do so or why he would insist upon Camco selling the mandrel and Camco valves together. On the contrary, there is everything to suggest that the right to "sell throughout the United States and all foreign countries" contemplated that the purchasers from Camco would, either initially or from the ordinary vicissitudes of actual oil operations, substitute valves freely in the mandrels thus sold. Recognizing that was to recognize the further obvious fact that with the valves being unpatentable, replacement valves might be supplied from a variety of sources.

To effectually utilize and exploit the commercial value of the license and obtain anything, Camco reasonably had to have the right to sell not only the completed combination, but to sell either separately or as a whole the components of it. It could hardly maintain a commercial service if, for example, to a customer who had formerly purchased the completed unit, Camco would have to inquire on a subsequent request for purchase of a mandrel only whether the Camco valves previously supplied would be used exclusively. The parties could, of course, have prescribed an arrangement having those unrealistic attributes, but the words used are far from that here, and we decline to read into them any such artificiality.

The result is that the decree is reversed and modified in part and otherwise affirmed. The cause is remanded for further consistent proceedings.

Affirmed in part, reversed and modified in part and remanded.